UNITED STATES of America,
Appellee,

v.

Peter SEEGER, Defendant-Appellant.

No. 293, Docket 27101.

United States Court of Appeals
Second Circuit.

Argued April 9, 1962.
Decided May 18, 1962.

See also 180 F.Supp. 467.

**480**

Paul L. Ross, New York City (Wolf, Popper, Ross, Wolf & Jones, New York City and Samuel M. Koenigsberg, Newark, N. J., of counsel), for defendant-appellant.

Arthur I. Rosett, Asst. U. S. Atty., Southern Dist. of N. Y., New York City (Robert M. Morgenthau, U. S. Atty., and Irving Younger, Asst. U. S. Atty., Southern Dist. of N. Y., New York City, on the brief), for appellee.

Before SWAN, MOORE and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

Peter Seeger appeals from a judgment of conviction entered after a trial before Thomas F. Murphy, District Judge, and a jury, on an indictment charging him with a refusal to answer ten questions asked by a subcommittee of the Committee on Un-American Activities of the House of Representatives, in violation of 2 U.S.C.A. § 192. Appellant was sentenced to imprisonment for the maximum term of one year on each of the ten counts in the indictment, to be served concurrently, and to pay the costs of his prosecution.[1]

Seeger, a musician and folk singer, appeared as a witness before the subcommittee on August 18, 1955 during hearings which were being conducted on the subject of communist infiltration in the field of entertainment in New York.[2] Although he answered a number of questions asked by members of the subcommittee and the subcommittee's counsel, Seeger refused to discuss allegations that he was connected with communist activities or had participated in functions allegedly sponsored by the Communist Party. The refusal was not based on a claim of constitutional privilege under the Fifth Amendment,[3] but generally on Seeger's expressed belief that the questions were either "improper" or "immoral."[4]

---

1. Bail pending appeal was denied by the District Court, but granted by a panel of this Court on April 4, 1961.

2. Two other persons summoned by this subcommittee (during the same hearings involved in the instant case) were indicted for violations of 2 U.S.C.A. § 192. They were acquitted after trials before Judge Sugarman, who held that the Government had not introduced sufficient competent evidence of the subcommittee's authority to conduct an investigation. The Government's principal evidence of authority, a resolution by the parent committee dated July 27, 1955, was held inadmissible because it was not included in a bill of particulars given to the defendants before trial. (As in this case, it was not mentioned in the indictment either.) U. S. v. Sullivan, C 152–238, S. D.N.Y. (Oct. 28, 1961) ; U. S. v. Yarus, 198 F.Supp. 425 (S.D.N.Y.1961).

3. U.S.Const. amend. V. Shortly after the questioning began, the following colloquy took place:

"Mr. Scherer. Let me understand. You are not relying on the fifth amendment, are you?
"Mr. Seeger. No, sir, * * * I simply feel it is improper for this committee to ask such questions.
"Mr. Scherer. And then in answering the rest of the questions, or in refusing to answer the rest of the questions, I understand that you are not relying on the fifth amendment as a basis for your refusal to answer?
"Mr. Seeger. No, I am not, sir" (Government Exh. 10, p. 2450).

4. When asked the question specified by Count 1 of the indictment, the witness stated:

"I am not going to answer any questions as to my associations, my philosophical or religious beliefs or my political beliefs, or how I voted in any election or any of these private affairs. I think these are very improper questions for any American to be asked, especially under such compulsion as this" (Government Exh. 10, p. 2449).
The questions which form the basis of

Nearly one year later, on July 25, 1956, appellant's refusal to answer those questions was reported to the House of Representatives; and the House thereupon voted to certify the report to the United States Attorney for prosecution. On March 26, 1957 the ten count indictment, predicated on appellant's refusal to answer ten stated questions, was filed.[5] Seeger pleaded not guilty, and subsequently moved to dismiss the indictment. In support of this motion it was argued, *inter alia*, that the indictment was defective because it failed "to state the authority of the sub-committee to conduct the inquiry before which the defendant was summoned as a witness." The motion was denied in an oral opinion delivered from the bench.[6]

On appeal, Seeger contends that his conviction should be reversed on several grounds. Among them he challenges the authority of the subcommittee, the manner in which the hearings were conducted, the Grand Jury proceedings, and the adequacy of the indictment; moreover, he urges us to consider several errors allegedly committed by the court below during trial. Some of these contentions pertain to claimed violations of appellant's rights under the First[7] and Fifth Amendments to the Constitution. However, we find it unnecessary to consider the merits of any of these arguments, except one: that the indictment was defective because it failed to properly allege the authority of the subcommittee to conduct the hearings in issue, and to set forth the basis of that authority accurately.

The "Contempt of Congress" statute under which this prosecution was brought, 2 U.S.C.A. § 192, states in part:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony * * * upon any matter under inquiry before * * * any committee * * * willfully makes default, *or who, having appeared, refuses to answer any question pertinent to the question under inquiry,* shall be deemed guilty of a misdemeanor * * *" (italics added).

A conviction for a violation of Section 192 cannot be sustained unless it appears

Counts 2, 3 and 4 were not answered for the "same" reason (id., pp. 2450–51). In response to the question named in Count 5, Seeger informed the subcommittee that he felt it was "immoral to ask any American this kind of question" (id., p. 2452). Questions cited in Counts 6, 8, 9 and 10 were not answered for the "same" reasons given earlier (id., pp. 2453–54, 2458, 2460). When asked to identify a photograph of himself (Count 7) the witness replied, "Let someone else identify it" (id., p. 2454).

5. The relevant portion of the indictment states as follows:

(caption omitted)

"The Grand Jury charges:

' "Introduction

"The Committee on Un-American Activities of the House of Representatives, having been duly created and authorized by the Legislative Reorganization Act of 1946, Public Law 601, Section 121(q) (1) (A) (2) (60 Stat. 828), and House Resolution 5, 84th Congress, on or about the 8th day of June, 1955, pursuant to said authorization, directed that an investigation be conducted of Communist infiltration in the field of entertainment in New York.

"Pursuant to said direction, in or about August, 1955, in the Southern District of New York, a duly constituted and authorized subcommittee of said Committee was holding hearings. In the course of said hearings, and on or about the 18th day of August, 1955, defendant Peter Seeger, having been summoned by the authority of the House of Representatives to give testimony, appeared as a witness before said subcommittee and was asked certain questions pertinent to the question under inquiry which pertinent questions the defendant deliberately and intentionally refused to answer.

"The allegations of this Introduction are adopted and incorporated into the counts of this indictment which follow, each of which counts will in addition designate the particular pertinent question which was asked of the defendant and which he refused to answer * * *"

6. U. S. v. Seeger, C 152–240, S.D.N.Y. (May 27, 1957).

7. U.S.Const. amend. I.

(1) that Congress had the constitutional power to investigate the matter in issue or to make the particular inquiry, Watkins v. U. S., 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); Sinclair v. U. S., 279 U.S. 263, 292, 49 S.Ct. 268, 73 L.Ed. 692 (1929); McGrain v. Daugherty, 273 U.S. 135, 173–174, 47 S.Ct. 319, 71 L.Ed. 580 (1927); Kilbourn v. Thompson, 103 U.S. 168, 196, 26 L.Ed. 377 (1880); (2) that the committee or subcommittee [8] was duly empowered to conduct the investigation, and that the inquiry was within the scope of the grant of authority, U. S. v. Rumely, 345 U.S. 41, 42–43 (1953) 73 S.Ct. 543, 97 L.Ed. 770; U. S. v. Lamont, 236 F.2d 312, 315 (2d Cir. 1956), affirming 18 F.R.D. 27, 33 (S.D.N.Y.1955); U. S. v. Orman, 207 F. 2d 148, 153 (3d Cir. 1953); U. S. v. Kamin, 136 F.Supp. 791, 793 (D.Mass. 1956); (3) that the question was pertinent to the authorized inquiry, Barenblatt v. U. S., 360 U.S. 109, 123, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Sacher v. U. S., 356 U.S. 576, 577, 78 S.Ct. 842, 2 L.Ed.2d 987 (1958); and (4) that the refusal to answer was deliberate and intentional, Quinn v. U. S., 349 U.S. 155, 165, 75 S.Ct. 668, 99 L.Ed. 964 (1955).

■■■ In order to determine whether an indictment which charges a violation of 2 U.S.C.A. § 192 is valid, the Court must examine it in light of the requirement of the Sixth Amendment to the Constitution, that "in all criminal prosecutions, the accused shall enjoy the right * * * to be informed of the nature and cause of the accusation" made against him. Procedurally, this means that an indictment must set forth an offense "with clearness, and all necessary certainty, to apprise the accused of the crime with which he stands charged," U. S. v. Mills, 7 Pet. 138, 142, 8 L.Ed. 636 (1833). Thus, it has been long recognized that "every ingredient of which the offence is composed must be accurately and clearly alleged in the indictment * * *" U. S. v. Cook, 17 Wall. 168, 174, 21 L.Ed. 538 (1872).[9]

"The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defence, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." U. S. Cruikshank, 92 U.S. 542, 558, 23 L.Ed. 588 (1875).

U. S. v. Debrow, 346 U.S. 374, 377, 378, 74 S.Ct. 113, 98 L.Ed. 92 (1953); Hagner v. U. S., 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932); Wong Tai v. U. S., 273 U.S. 77, 80–81, 47 S.Ct. 300, 71 L.Ed. 545 (1927); Evans v. U. S., 153 U.S. 584, 587, 14 S.Ct. 934, 38 L.Ed. 830 (1894); U. S. v. Hess, 124 U.S. 483, 487, 8 S.Ct. 571, 31 L.Ed. 516 (1888); U. S. v. Achtner, 144 F.2d 49, 51 (2d Cir. 1944).

■■ In view of this constitutional mandate, and the undisputed fact that the Government must establish that a committee or subcommittee was duly authorized and that its investigation was within the scope of the delegated authority, an indictment under Section 192 is defective if the authority is not pleaded, U. S. v. Lamont, supra.

---

8. Section 192 applies to subcommittees as well as to committees of Congress. Barenblatt v. U. S., 100 U.S.App.D.C. 13, 240 F.2d 875, 878, vacated on other grounds, 354 U.S. 930, 77 S.Ct. 1394, 1 L.Ed.2d 1533 (1957), aff'd on rehearing, 252 F.2d 129 (1958), aff'd, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).

9. "[E]very ingredient * * * must be clearly and accurately set forth, and * * * the indictment must be free from all ambiguity, and leave no doubt in the minds of the accused and the court of the exact offence intended to be charged * * *." Ledbetter v. U. S., 170 U.S. 606, 609–610, 18 S.Ct. 774, 42 L.Ed. 1162 (1898); see also, Cochran and Sayre v. U. S., 157 U.S. 286, 290, 15 S.Ct. 628, 39 L.Ed. 704 (1895).

"The cornerstone of the Government's case in any prosecution under § 192 must be a lawfully constituted committee engaged in an inquiry within the scope of its authority when the refusal to answer occurred. This is the hard core of its case against the defendant and he is entitled to have it pleaded in the indictment." [10]

Furthermore, as Judge Weinfeld pointed out in the lower court opinion in the Lamont case,

"There is an added reason why this element should be pleaded. With pertinency also an essential element, it is important for the defendant in preparing his defense to know the claimed source of authority since 'The initial step in determining the pertinency of the question is to ascertain the subject matter of the inquiry then being conducted by the subcommittee.' [Bowers v. United States, 92 U.S. App.D.C. 79, 202 F.2d 447, 448.] Or, as stated by Mr. Justice Frankfurter in the Rumely case, the resolution under which the committee purports to act is the 'controlling charter' of its powers and governs 'its right to exact testimony.' [United States v. Rumely, 345 U.S. 41, 44, 73 S.Ct. 543, 545, 97 L.Ed. 770.] *Since pertinency must be and has been pleaded, there is no logical reason why the authority of the committee should not likewise be plead-*

*ed."* Id., 18 F.R.D. pp. 33–34 (italics added).[11]

The Government does not appear to contest this.[12] Instead, it seeks to have us disregard and overrule the pertinent and correlative holding of U. S. v. Lamont, supra, that it is not enough to allege the subcommittee was "duly authorized," but that "the source of its claimed authority, whether it be a resolution of the [House of Representatives] or the parent committee [Cf. United States v. DiCarlo, D.C.N.D.Ohio, 102 F.Supp. 597] should be alleged in the indictment." [13]

■■ This we cannot do. The Federal Rules of Criminal Procedure unmistakably require the Government to plead *"the essential facts* constituting the offense charged," Rule 7(c), Fed.R. Crim.P., 18 U.S.C.A. (italics added), and not mere legal conclusions. As we have already noted, the basic function of an indictment is to inform the defendant so that he may defend himself. See, Scott, A Fair Trial for the Accused, 41 Minn.L.Rev. 509, 518 (1957).[14] "For this, facts are to be stated, not conclusions of law alone," U. S. v. Cruikshank, supra. Anxious as we are to avoid overelaboration and formalism, we cannot condone "a formalism of generality." [15]

Moreover, unless we disregard as mere surplusage certain allegations in the indictment before us, a course not urged by the Government, it is perfectly clear that the prosecutor recognized that it was necessary to allege facts indicating the

---

10. 18 F.R.D. 35.

11. "The holding in the instant case [Lamont] is not contrary to the modern design of pleading. If the authority of the tribunal will be considered prior to the elements of pertinency and constitutionality, the grant of authority should be a separate element and should be alleged in the indictments brought pursuant to section 192." Note, 24 Geo.Wash.L.Rev. 342, 344 (1956).

12. In U. S. v. Josephson, 165 F.2d 82, 84–85 (2d Cir. 1947), cert. denied, 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122 (1948), this Court seems to have approved an indictment which failed to plead the

authority of a subcommittee which conducted hearings out of which the contempt arose. However, an examination of the briefs on appeal in that case reveals that the issue had not been raised, and that the challenge made to the adequacy of the indictment was based upon other grounds. Therefore, the blanket approval given to the indictment cannot be considered a holding on this particular point.

13. 18 F.R.D. 33.

14. Cf. U. S. v. Pape, 144 F.2d 778, 781 (2d Cir.), cert. denied, 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944).

15. Clark, J., in U. S. v. Lamont, 2 Cir., 236 F.2d 317.

subcommittee's authority. The first paragraph of the indictment purports to relate the substance of a resolution passed by the Committee on Un-American Activities on June 8, 1955 directing the subcommittee to conduct the investigation.[16] The second paragraph then states that "pursuant to said direction" the subcommittee conducted the hearings at which Seeger appeared as a witness. But the resolution of June 8, 1955 (Government Exh. 9, p. 2260) was *not* such an authorization to the subcommittee. It was merely a direction to the parent Committee's clerk to proceed with an investigation. See U. S. v. Yarus, supra, 198 F.Supp. at p. 427. The resolution of July 27, 1955 (Government Exh. 8), which actually purports to authorize the subcommittee to proceed with the hearings was nowhere mentioned. In other words, instead of a "clear," "accurate" and "unambiguous" allegation of the essential facts indicating the subcommittee's authority, the indictment contained a wholly misleading and incorrect statement of the basis of that authority.[17] This not only runs afoul of accepted notions of fair notice, but goes "to the very substance of whether or not any crime has been shown." U. S. v. Lamont, 236 F.2d 316.

 The possibility that a defendant might obtain this essential information by means of a bill of particulars does not affect our conclusion. A bill of particulars cannot repair a fatal defect in an indictment, U. S. v. Lamont, supra, at p. 315, because the defendant has a constitutional right to a fair and accurate accusation by indictment; and there is no unconditional right to a bill of particulars, U. S. v. Bentvena, D.C., 193 F.Supp. 485, 498 (1960). Furthermore, in the instant case, although the trial court did order the Government to specify the basis of the subcommittee's authority in a bill of particulars, the vital resolution of July 27, 1955 (Government Exh. 8) was not produced in compliance with that order.[18]

 There can be no doubt that it is the duty of every citizen to help Congress obtain information which it needs to legislate intelligently and effectively. It should be expected that persons summoned before a Congressional committee will respect its dignity; and a witness has an "unremitting obligation * * * to testify fully with respect to matters within the province of proper investigation." Watkins v. U. S., supra, 354 U.S at pp. 187, 188.

When Congress believes that its authority has been flouted by improper behavior of a witness who has refused to give testimony before one of its subcommittees, and has voted that the witness be prosecuted for contempt, it is incumbent upon the courts to apply the

---

16. See n. 5, p. 1872, supra.

17. The U. S. Court of Appeals for the District of Columbia has held that an indictment under Section 192 need not recite "details of the authority" of the committee. Sacher v. U. S., 102 U.S.App.D.C. 264, 252 F.2d 828, 831, rev'd on other grounds, 356 U.S. 576, 78 S.Ct. 842, 2 L.Ed.2d 987 (1958). The Sacher opinion offers no rationale in support of its conclusion; and it makes no reference to the Lamont case. Furthermore, the Court was concerned with the issues raised by a remand of an earlier decision in that case (240 F.2d 46 (1957)) by the Supreme Court for reconsideration in light of Watkins v. U. S., supra. Hence, it would seem that this particular issue was considered primarily in terms of questions raised in Watkins, rather than the question squarely presented to us.

18. In addition to the Government's failure to allege the resolution of July 27, 1955 in the indictment (filed March 26, 1957), the absence of any reference to it in the bill of particulars served October 13, 1959, and the lack of any indication that it existed until two weeks before trial in March, 1961, i. e., four years after the Grand Jury proceedings, suggest that the Grand Jury may not have received evidence on the issue of the subcommittee's authority. "If the Grand Jury did not have before it prima facie evidence that the committee was empowered to conduct the inquiry whether by resolution or otherwise, there was no basis for the return of the indictment. '[A] wrongful indictment inflicts a substantial harm on the indicted person * * *' [In re Fried, 2 Cir., 161 F.2d 453, 465, 1 A.L.R.2d 996]." U. S. v. Lamont, 18 F.R.D. 35.

sanctions provided by law for that offense. "But when Congress seeks to enforce its investigating authority through the criminal process administered by the federal judiciary, the safeguards of criminal justice become operative," U. S. v. Sacher, 356 U.S. 577, 78 S.Ct. 843. The issue then is not only whether Congress, or the prosecutor, or even a judge might believe that the defendant is guilty of contempt; it is whether he has been accused and tried in full compliance with the transcending principles of fairness embodied in our Constitution and protected by our law.

"When society acts to deprive one of its members of his life, liberty or property, it takes its most awesome steps. No general respect for, nor adherence to, the law as a whole can well be expected without judicial recognition of the paramount need for prompt, eminently fair and sober criminal law procedures. The methods we employ in the enforcement of our criminal law have aptly been called the measures by which the quality of our civilization may be judged." Coppedge v. U. S., 82 S. Ct. 917.

In this instance we have concluded that the prosecutor cannot put a gloss on the essential and basic teachings of the Lamont case, fortified by constitutional holdings of the Supreme Court. A defendant, faced with possible loss of liberty, should not, at the commencement of the prosecution, be made to guess whether the inquiring body had power to exact his testimony. The burden placed upon the prosecutor by a requirement that he adequately and accurately allege facts indicating the existence of this element of the crime is minor; and the Government is in no way prejudiced in its attempt to vindicate the authority of Congress. On the other hand, the benefit derived from that requirement by the accused is substantial; and the benefit is wholly consistent with, and we believe dictated by principles of fundamental fairness.

■ The Government would dispose of appellant's argument as a "hypertechnical" challenge to a conviction warranted by the evidence. But an assertion that a prosecution must begin with a fair and accurate accusation involves more than mere technicality or form. It goes to substance. We are not inclined to dismiss lightly claims of constitutional stature because they are asserted by one who may appear unworthy of sympathy. "Once we embark upon shortcuts by creating a category of the 'obviously guilty' whose rights are denied, we run the risk that the circle of the unprotected will grow." U. S. v. Tribote, 297 F.2d 598, 604 (2d Cir. 1961).

Reversed and indictment dismissed.

MOORE, Circuit Judge (concurring in the result).

The majority has limited its consideration to the single issue, namely, "that the indictment was defective because it failed to properly allege the authority of the subcommittee to conduct the hearings in issue, and to set forth the basis of that authority accurately." The defects in the validity of the indictment are stated in terms of the right of the accused "to be informed of the nature and cause of the accusation" (Sixth Amdt., U. S. Const.) and procedurally that the indictment accurately and clearly allege every ingredient of the offense charged. Relying, even after trial, more on pleading than on proof, the opinion asserts that "the Government must establish that a committee or subcommittee was duly authorized and that its investigation was within the scope of the delegated authority" and concludes that "an indictment under Section 192 is defective if the authority is not pleaded," supporting this assertion by a quotation from the district court in United States v. Lamont, 18 F.R. D. 27, 35, premised upon the underlying fact that the indictment (in the Lamont case) "is barren of any allegation or fact from which the authority of the Permanent Subcommittee to conduct the inquiry can be ascertained."

And so it was. The indictment merely recited that the Permanent Subcommittee on Investigations of the Committee on Government Operations was holding hearings pursuant to Public Law 601 and various Senate Resolutions. No allegations whatsoever of authority or scope were alleged. In substance, all that the court had before it in Lamont was a Committee (originally entitled "Committee on Expenditures in the Executive Departments") authorized to inquire into governmental activities to determine "its economy and efficiency." The court held that "[S]ince the indictments fail[ed] to plead a willful or a deliberate and intentional refusal to answer, they [were] defective on this ground alone" (18 F.R.D. at 32.) The court, however, went further and held that the essence of the Lamont offense was the "refusal of a witness to answer a question pertinent to an inquiry before a lawfully constituted committee, acting within the scope of its authority" (18 F.R.D. at 32). With "pertinency" injected into the prerequisites to conviction, "authority," obviously, must be shown to determine pertinency. Little wonder that the court had insuperable difficulty in finding the pertinency to governmental "economy and efficiency" of four questions asking the witness whether he was a member of the Communist party.

In contrast, the indictment against Seeger alleges that "The Committee on Un-American Activities of the House of Representatives, having been duly created and authorized by the Legislative Reorganization Act of 1946, Public Law 601, Section 121(q) (1) (A) (2), (60 Stat. 828), and House Resolution 5, 84th Congress, on or about the 8th day of June, 1955, pursuant to said authorization, directed that an investigation be conducted of Communist infiltration in the field of entertainment in New York." The indictment continues "Pursuant to said direction, in or about August, 1955, in the Southern District of New York, a duly constituted and authorized subcommittee of said Committee was holding hearings." It then alleged in conclusory

form that the witness "was asked certain questions pertinent to the question under inquiry which pertinent questions the defendant deliberately and intentionally refused to answer."

Following the Lamont district court's rejection of "duly authorized" as a sufficient allegation, the majority does not, in my opinion, adequately heed or accept this court's decision in United States v. Josephson, 2 Cir., 1947, 165 F. 2d 82 (Swan, Chase, Clark, C.JJ.). However, the Josephson case and the Seeger case, unlike Lamont, both came before this court after trial and conviction rather than on a technical attack upon the indictment. The indictment in Josephson alleged that pursuant to Public Law 601 and House Resolution 5, 80th Congress, the House was empowered to and did create the Committee on Un-American Activities and that the witness was summoned "by authority of the House of Representatives through its Sub-Committee of the Committee on Un-American Activities." There were no direct allegations, as are found here, that the Committee was "duly created and authorized." Nor was there any specific statement of purpose such as is found here, namely, that the Committee "directed that an investigation be conducted of Communist infiltration in the field of entertainment in New York." Yet the court in Josephson said of the indictment:

"[1, 2] The above quoted indictment conforms to the requirements of Rule 7(c), Federal Rules of Criminal Procedure, 18 U.S.C.A., following séction 687, 327 U.S. 821, 839, and was rightly held sufficient. Indeed, it is a good example of 'a plain, concise and definite written statement of the essential facts constituting the offense charged.' It enabled the appellant to understand the nature of the accusation, gave him the needed information to prepare his defense, and made it possible for him to plead the judgment in bar of another prosecution for the same offense should occasion for

doing so arise. That, as we have often held, is enough to make an indictment good. United States v. Fried, 2 Cir., 149 F.2d 1011, certiorari denied, 326 U.S. 756, 66 S.Ct. 97, 90 L.Ed. 454; United States v. Wodiska, 2 Cir., 147 F.2d 38; United States v. Achtner, 2 Cir., 144 F.2d 49."

I cannot distinguish the decision in the Josephson case as to the form and sufficiency of the indictment except to believe that the Seeger indictment is a more specific document and, hence, I would hold the indictment as such to be sufficient.[1] But even assuming the validity of the indictment, "the next issue is whether there was enough evidence to support the verdict" (Josephson, 165 F.2d p. 86). Since authority and subject matter of inquiry relate directly to the pertinency of the questions asked, both are important. As to the Committee, the court in Josephson said, "The trial court properly took judicial notice of the Legislative Reorganization Act of 1946, 60 Stat. 812, 828, setting forth the duties and the powers of the Committee on Un-American Activities" (p. 87). The same Act is here pleaded and the Committee's powers should not have to be copied into the indictment.

Seeger's refusal to answer did not occur before the Committee but only before a Sub-Committee. For this reason, Seeger argues that the authority of the subcommittee must be shown. Although creation of the Committee may be adequately alleged in the indictment,[2] this fact does not dispense with the necessity of proving upon the trial the authority of the subcommittee before which Seeger refused to answer, commonly known as proof of the "chain of authority." The government offered a document dated June 8, 1955 (Exh. 7) authorizing the Clerk to "proceed with the investigation of communist infiltration in the field of entertainment in New York." Had Seeger appeared before the Clerk and refused to answer, it is more than questionable whether this could have been a Section 192 violation. Had the Clerk proceeded to appoint a subcommittee, his power so to do would have been equally doubtful. But neither of these events occurred.

Somewhat in advance of trial, the government disclosed to Seeger a document (Exh. 8), dated July 27, 1955 (not mentioned in the indictment or in the government's bill of particulars), merely announcing a date for the hearings (August 15–18) and stating the names of the subcommittee appointed. The government characterizes this document as a resolution passed by the Committee on July 27, 1955, directing the hearings and ratifying the appointment of the subcommittee. Even the most liberal construction cannot transform Exhibit 8 into a resolution of the Committee vesting its authority in a subcommittee and ratifying a previously appointed group of three. I would, therefore, hold that there had been a failure of proof of authority. I realize that this conclusion may seem as technical as the majority's decision on the inadequacy of the indictment but in contempt proceedings decisional law seems to approve reliance upon technicalities.

At the hearing on August 15, 1955, the Committee Chairman, Francis Walter, clearly stated the purpose and scope of the inquiry, i. e., "the extent to which the Communist Party is active in the entertainment media" and "to ascertain, and to identify individuals who are or were members of the Communist Party and who are using or did use their influence to promote the objectives of the

---

1. I construe the decision in United States v. Yarus, S.D.N.Y., 198 F.Supp. 425 (1961) as based upon an inadequacy of proof because of the trial court's belief that the July 25, 1955 document (Exh. 8) was inadmissible on the ground that it had not been set forth in the bill of particulars rather than upon any insufficiency of the indictment as a matter of pleading.

2. The indictment alleges that the Committee was "duly created and authorized" and that "a duly constituted and authorized subcommittee of said committee was holding hearings" [in or about August, 1955].

Communist Party within the entertainment field." There is nothing in the record to show that Seeger was present or heard this statement. When Seeger appeared on August 18, 1955, he was asked the question, "May I ask you whether or not the Allerton Section was a section of the Communist Party?" (Count 1), to which he gave a completely nonresponsive and irrelevant answer which apparently was a prepared statement he was determined to make regardless of the question:

> "I am not going to answer any questions as to my associations, my philosophical or religious beliefs or my political beliefs, or how I voted in any election or any of these private affairs. I think these are very improper questions for any American to be asked, especially under such compulsion as this" (GX10, p. 2449).

Equally irrelevant answers were made to other questions which prompted the Chairman to reply in answer to a statement by appellant, "I love my country very deeply, sir," "Why don't you make a little contribution towards preserving its institutions?"

Despite such colloquies, upon a reading of the entire record, I gain the impression that Seeger felt that he had a particular kind of right of privacy, asserted by some in complete disregard of serious Congressional investigations conducted for the welfare of the nation, but that his refusal lacked the elements of criminality. He did not rely on the Fifth Amendment but couched his refusals in terms of "improper" and "immoral." His irrelevant self-serving replies were more than obvious because no one had asked him concerning his religious or political beliefs or how he had voted in an election. However, these answers probably come forth from a (in my opinion only misguided) personal conception of private rights rather than from a desire to be contemptuous of his country or the subcommittee. At this point of the examination it might have been well for the examiner to have heeded the example set forth in footnote 5 of Wilkinson v. United States, 365 U.S. 399, 404–406, 81 S.Ct. 567, 5 L.Ed.2d 633 (1961) and to have advised Seeger as to the pertinency of the questions to the matter which the Committee was authorized to investigate. See also Deutch v. United States, 367 U.S. 456, 467–468, 81 S.Ct. 1587, 6 L.Ed.2d 963 (1961); Sacher v. United States, 356 U.S. 576, 78 S.Ct. 842 (1958); Watkins v. United States, 354 U.S. 178, 208–209, 77 S.Ct. 1173 (1957). After all Seeger was a layman whose mind might well have been concentrating on new songs rather than new legislative enactments. Furthermore, the personalized question as to whether he was a member of the Communist Party or the inquiry as to the places of his performances were scarcely calculated to be so related to the authorized inquiry as to be self-evident without some enlightening explanation.

For the reasons stated, I do not believe that the Government has satisfied the requirements necessary to sustain the conviction and, hence, I would reverse and dismiss the indictment for insufficiency of proof.